John J. NICHOLL, in his individual capacity as County Commissioner of the County of Arapahoe; and John J. Nicholl, a resident of the County of Arapahoe, Petitioner,

v.

E–470 PUBLIC HIGHWAY AUTHORITY, a body corporate and political subdivision of the State of Colorado; Margaret N. Carpenter; Nadine Caldwell; Donald Hamstra; James R. Sullivan; Harold E. Kite; Greg Lopez; and Thomas R. Eggert, in their individual official capacities as Directors of the E–470 Public Highway Authority; and The State of Colorado, Respondents.

No. 94SC307.

Supreme Court of Colorado,
En Banc.

May 15, 1995.

Tallmadge, Wallace, Hahn, Smith & Walsh, P.C., David J. Hahn, John W. Smith, III, Edward J. Walsh, Cynthia A. Calkins, Denver, Susan Broyles, Greenwood Village, for petitioner.

Ankele, Icenogle, Norton & White, P.C., Charles E. Norton, T. Edward Icenogle, Holme, Roberts & Owen, L.L.C., Jeffrey A. Chase, Mary Hurley Stuart, McKenna & Cuneo, Daniel S. Hoffman, Denver, for E–470 Public Highway Authority.

No appearance on behalf of respondents Margaret N. Carpenter, Nadine Caldwell, Donald Hamstra, James R. Sullivan, Harold E. Kite, Greg Lopez, Thomas R. Eggert.

No appearance on behalf of respondent State of Colo.

Kutak Rock, Cassandra G. Sasso, Michael R. Johnson, Craig N. Johnson, Denver, for amici curiae City and County of Denver, Colorado Ass'n of Municipal Utilities, Colorado Ass'n of School Boards, Colorado Community Revitalization Ass'n, Colorado Health Facilities Authority, Colorado Municipal League, Northglenn Urban Renewal Authority, Pueblo County, and Special Dist. Ass'n of Colorado.

Mark Hannen, Castle Rock, for amicus curiae County of Douglas.

Charles H. Richardson, Jr., Michael J. Hyman, Aurora, Becker Stowe Bowles & Lynch, P.C., Daniel C. Lynch, Denver, for amicus curiae City of Aurora.

Daniel, McCain, Brown, Wallace & Brubaker, L.L.C., Margaret R. Brubaker, Brighton, for amicus curiae City of Brighton.

Banta, Hoyt, Greene & Everall, P.C., Jane Brautigam, Englewood, for amicus curiae City of Greenwood Village.

Kevin Maggio, Margaret A. Emerich, Thornton, for amicus curiae City of Thornton.

Justice MULLARKEY delivered the Opinion of the Court.

The Board of County Commissioners of the County of Arapahoe, Colorado, John J. Nicholl, in his individual capacity as County Commissioner of Arapahoe County and as a resident and taxpayer of Arapahoe County, and Jeannie Jolly, in her individual capacity as County Commissioner of Arapahoe County and as a resident and taxpayer of Arapahoe County (collectively "the County") petitioned for certiorari review of *Board of County Commissioners v. E-470 Public Highway Authority*, 881 P.2d 412 (Colo.App. 1994). In *E-470 Public Highway Authority*,

the court of appeals affirmed on different grounds the trial court's judgment against the County and for the defendants. The defendants below and respondents here are the E-470 Public Highway Authority, Margaret N. Carpenter, Nadine Caldwell, Donald Hamstra, James R. Sullivan, Harold E. Kite, Greg Lopez, and Thomas R. Eggert, in their individual capacities as Directors of the E-470 Public Highway Authority, and the State of Colorado (collectively the "Authority").

The court of appeals held that the Authority is an "enterprise" rather than a "district," and therefore not subject to the election requirements of Amendment 1. *Id.* at 414–15. In the alternative, the court of appeals held that section 4(b) does not apply to the Authority's plan to release $570,000,000 of bond proceeds from pledged accounts to build Segments II and III of the E-470 highway and that section 7(d) does not apply to revenues and expenditures of the Authority to increases in revenue to repay that debt.

We affirm in part and reverse in part the judgment of the court of appeals. We reject the court of appeals' enterprise analysis and hold that the Authority is subject to Amendment 1. We affirm the court of appeals' holding that the debt and revenue expenditures in this case that were approved by the voters prior to the effective date of Amendment 1 are not subject to Amendment 1. However, we also hold that repayment obligations undertaken by the Authority since the effective date of Amendment 1 are subject to its voter approval requirements.

I.

On February 25, 1985, Adams County, Arapahoe County, and Douglas County entered into an agreement (the "Intergovernmental Agreement") to create an agency that would coordinate the "planning, funding and construction" of an approximately 48-mile long "limited access highway" located around the northern, eastern and southern perimeters of the Denver metropolitan area and designated as E-470 (the "E-470 highway").[1]

1. Participating governments entered into the Intergovernmental Agreement pursuant to Colo. Const. art. XIV, § 18(2)(a) and (b), the intergov-ernmental cooperation provision, and its legislative implementing provisions found in §§ 29-1-201 to -205, 12A C.R.S. (1986 & 1994 Supp.)

On August 1, 1986, the participating governments entered into a related agreement, the E–470 Memorandum of Understanding. Under the Memorandum of Understanding the participating governments agreed among other things that, because the E–470 Agency had no express power to incur debt, Arapahoe County would issue revenue bonds to finance all or some portion of the costs of the E–470 highway. The proceeds from the sale of the bonds were to pay the initial costs of constructing the E–470 highway and to fund related reserves and insurance expenses.

On August 27, 1986, at a special meeting, the Board of County Commissioners of Arapahoe County (the "Arapahoe County Board") adopted the "Master Resolution," which authorized the issuance of the $722,010,000 Arapahoe County, Colorado, Capital Improvement Trust Fund Highway Revenue Bonds, Series 1986A through 1986M (the "Bonds"). In addition to authorizing the issuance of the Bonds, the Master Resolution provided for various funds and accounts and the terms under which the E–470 financing plan would be administered.[2] On August 28, 1986, Arapahoe County issued the Bonds pursuant to the County Capital Improvement Trust Fund Financing Act, §§ 30–26–501 to –513, 12A C.R.S. (1986).

The Bonds were issued as the initial step in "setting a framework for future financing" under the Memorandum of Understanding.[3] The sales document prepared for the public offering and sale of the Bonds disclosed that because the E–470 Agency did not have the power to incur debt, the Bonds were issued by Arapahoe County to "pay the costs of acquisition, construction and improvement" of the E–470 highway; the Bonds were payable only from identified revenue sources; and the Bonds were "not in any way to be construed to be a debt or liability of the State of Colorado or any political subdivision thereof. . . ." Until the Bond proceeds were to be disbursed, the net proceeds from the sale of the Bonds was immediately deposited into pledged accounts as set forth in the Pledged Fund Agreement between Arapahoe County and the Authority.

Under the financing scheme of the Pledged Fund Agreement, the Bonds come due at predetermined six-month periods and have a forty-year long-term maturity date. The funds in the pledged accounts are used to purchase government obligations[4] that mature and bear interest at rates sufficient to pay the full redemption price and all accrued interest on the Bonds when due. At the end of each six-month period, if the E–470 Agency is not in a position to use Bond proceeds for construction of the E–470 highway, the Bonds are remarketed and a similar pledged account established, thereby creating a "rollover" of funds.

As each interest rate period for each series of Bonds expires, the remarketing agent for the County resets the interest rate and remarkets the Bonds. The interest rate of the Bonds can be set in one of two ways: the lesser of 15% per annum or a market rate computed on the remarketing date which

---

(collectively referred to as the "Cooperation Act"). The authority and scope of the Cooperation Act are not raised by the parties on appeal. For purposes of resolving the issues before us, we assume no acts were committed contrary to those provisions.

2. The Master Resolution also governed the terms under which the Bonds were marketed, redeemed and secured. The Resolution specifically authorized the adoption of supplemental resolutions to make certain modifications to the bond documents under specified circumstances, but did not authorize changes to the material terms of the bonds, *e.g.*, the principal amount, maturity date, mandatory redemption provisions, the source of payment or use of proceeds.

3. The bond sales documents disclosed that pending federal tax legislation, H.B. 3828, could have impacted adversely the favorable tax treatment of any interest paid to bondholders if the Bonds were not issued before September. Because such a result would affect the market for the Bonds and might alter or reduce the proceeds available from the sale of the Bonds, the participating governments wanted to issue the Bonds prior to September 1986, even though they were not ready to begin construction of the E–470 highway.

4. Under the Official Statement, government obligations were defined as bonds or other interest-bearing obligations of the United States or obligations unconditionally guaranteed by the United States, or notes on bonds secured under Title II of the National Housing Act, provided that, at the time of acquisition, they are rated AAA by Standard & Poors Corporation.

would remain in effect only until the next six-month remarketing date; or the lesser of 15% or the market rate that would remain in effect until the maturity of the Bonds. During the period of August 1986 through March 1993, the Bonds were remarketed fifteen times. As a result of the remarketing transactions, the E–470 Agency earned approximately $55,000,000 of arbitrage profit (the difference between the interest earned on the allowable investments and the interest on the Bonds paid to bondholders).

At the end of each six-month period, if the E–470 Agency and later its successor, the Authority, were in a position to use the Bond proceeds for construction and other project costs, funds can be released from the pledged accounts if the Authority meets the requirements under the Pledged Fund Agreement. Before receiving any Bond proceeds, the original Pledged Fund Agreement required the E–470 Agency to obtain certification of project approval and to assure that certain bond repayment criteria were satisfied.

Approximately one year after the 1986 Bonds were issued, the General Assembly passed the Public Highway Authority Law. §§ 43–4–501 to –522, 17 C.R.S. (1993) (the "PHA Law"). Section 43–4–502(1)(c) of the PHA Law provides that "public highway authorities be formed to finance, construct, operate, or maintain all or a portion of a beltway or other transportation improvement in a metropolitan region." Section 43–4–506 of the PHA Law also grants certain powers to an authority including the power to issue bonds, assess and collect vehicle registration fees, impose sales and use taxes, and charge tolls for highway use.

In January of 1988, pursuant to the PHA Law, the parties to the Intergovernmental Agreement entered into the "Establishing Contract," in order to establish the current E–470 Public Highway Authority.[5] The Establishing Contract provided that the new Authority would be entitled to all rights and privileges, and could assume all obligations and liabilities of the original E–470 Agency, and "shall assume all obligations and liabili-

ties" of Arapahoe County with respect to "bonds previously issued by Arapahoe County for the planning, designing, engineering, acquisition, installation, construction and reconstruction of E–470." However, each constituent government retained "exclusive control over alignment . . . within its jurisdiction." Then, in 1989, the participating governments entered into the Delegation and Substitution Agreement (the "Delegation Agreement"). Pursuant to the Delegation Agreement, the parties consented "to delegate all of their rights and responsibilities under the [1986] Memorandum of Understanding to the original [E–470 Agency] on the condition that the original [E–470 Agency] redelegate such rights and responsibilities to the [Authority]."

In November of 1988, an election was held to obtain voter approval of a ten-dollar motor vehicle registration fee to provide funds to finance the E–470 highway. The vote was conducted within voting boundaries that included only portions of the jurisdictions of the participating governments, generally along precinct lines. A majority of the voters approved the registration fee to be effective January 1989, in portions of Adams, Arapahoe and Douglas counties.

In 1989, the Authority began construction of Segment I of the E–470 highway. It funded the project with the proceeds of one series of Bonds. The Bonds from the other series continued to be routinely remarketed in contemplation of the ultimate construction of other segments of the E–470 highway. Two years later, in June of 1991, Segment I of the E–470 highway was opened to traffic. Since the opening of the limited access highway, the Authority continually has collected tolls from users of the highway in addition to the ten-dollar motor vehicle registration fee approved by voters.

In 1992 and 1993, the Authority proposed alternative alignments for the remaining segments of the E–470 highway designed to increase projected traffic and toll revenues

---

**5.** Pursuant to later amendments, the City of Aurora, the Town of Parker, the City of Thornton, and the City of Brighton became parties to the Establishing Contract so that, as of May 3, 1991, there were seven participating governments.

from the highway.[6] The Arapahoe County Board initially supported the proposed realignment by the passage of Arapahoe County Resolution No. 476–92 in April, 1992. Then in January 1993, the Arapahoe County Board held a public hearing to discuss the alignment of E–470 during which residents and developers expressed strong opposition to the proposed realignment. Apparently in response to sentiment in opposition to the proposed realignment, the Arapahoe County Board changed its position and repudiated its support.

The Authority nonetheless voted to approve the realignment of the E–470 highway on June 30, 1993. The Authority acted pursuant to a June 1, 1993 amendment to the PHA law,[7] which permitted the Authority to determine the location of the alignment by a two-thirds vote, see section 43–4–506(4), and pursuant to its interpretation of the Establishing Contract and the Delegation Agreement.

At roughly the same time, the Authority began to take the steps necessary to begin construction of segments II and III of the E–470 highway. According to the Authority's Plan of Finance, the funds necessary to finance construction of the remaining segments of E–470 would come from two sources: the remaining Bond proceeds and intergovernmental loans. In order to provide for the release of the Bond proceeds from the pledged accounts, the Bonds would be remarketed and would be secured by the vehicle registration fees and other Authority revenues instead of the pledged accounts. These fees and other revenues would be deposited in a trust fund which could be expended only to service the debt and to maintain the road. See E–470 Public Highway Authority, 881 P.2d at 420. Additional loans would come from the Colorado Department of Transportation, at least one of the local constituent governments, and the project contractor. While the loan obligations would be subject to the annual appropriations of the creditor governmental entities, repayment would be secured by bonds payable from Authority revenue after the E–470 Bonds were paid.

In order to implement this plan, the Authority tendered several supplemental resolutions to the Arapahoe County Board in June and July of 1993. The Arapahoe County Board, however, refused to approve any of the supplemental resolutions because it opposed the decision made by the Authority to shift the alignment of the E–470 highway.

The County then filed this suit in the Arapahoe County District Court. The complaint sought a declaration that H.B. 1316, the house bill which amended the PHA Law in 1993, is unconstitutional; that the County did not delegate its rights under the Bonds or its rights in determining the E–470 alignment; and that the proposed remarketing of the Bonds without prior voter approval violated the debt and revenue limitations of Amendment 1. The Authority filed a counterclaim seeking relief under H.B. 1316 in the nature of a writ of mandamus, claiming that H.B. 1316 is constitutional; that Amendment 1 is not applicable to the bond remarketing; and that the Authority is an "enterprise" as defined under Amendment 1 and therefore not subject to the voter approval requirements of Amendment 1.

The trial court entered judgment in favor of the Authority and against the County. It found that H.B. 1316 is constitutional and ruled the Authority is a "district" subject to the voter approval requirements of Amendment 1. However, the trial court concluded that the Authority was not required to hold

---

**6.** An alignment shift to increase traffic and, as a consequence, to increase revenue from tolls, is consistent with the PHA Law which states that "it is the intention of the general assembly that a beltway developed pursuant to [the PHA Law] shall ultimately be supported by tolls...." § 43–4–502(d).

**7.** Effective June 1, 1993, the General Assembly adopted H.B. 1316, which provided certain amendments to the PHA Law. See ch. 213, sec. 1, § 43–4–506, 1993 Colo.Sess.Laws 960. In particular, H.B. 1316 granted authority to public highway authorities to "determine the location of the alignment of the public highway." § 43–4–506(4). In addition, the new amendments increased the permissible boundaries of public highway authorities to "not more than two and one-half miles from the proposed center line of the public highway." § 43–4–506(3)(a). At that time, the E–470 Authority's boundaries did not exceed one and one-half miles.

an election before remarketing the 1986 Bonds or implementing the 1993 Plan of Finance. The trial court denied the Authority's petition for writ of mandamus as unnecessary, and concluded that "since the County has already assigned the [E–470] Authority all of its rights and privileges regarding the bonds, the [E–470] Authority, as assignee of the County, is able to execute documents necessary for bond remarketing." In a posttrial order, the trial court also granted the defendants' motion to alter or amend judgment and ruled that "the collection and spending of revenues as proposed in the 1993 Plan of Finance is not subject to the election provisions of Amendment [1]."

The petitioners appealed. The court of appeals agreed with the trial court's conclusion that Amendment 1 does not apply to the Authority's 1993 Plan of Finance. However, the court of appeals reversed the trial court's ruling that the Authority is a district and concluded that the Authority is an "enterprise" and therefore not subject to the election requirements of Amendment 1. The court of appeals affirmed the remainder of the trial court judgment in all respects.

We granted certiorari to review four questions:

1. Whether the court of appeals erred in holding that the E–470 Authority is an enterprise and therefore, Amendment [1] does not apply to it;

2. Whether the court of appeals erred in holding that even if Amendment [1] applies to the E–470 Authority, Section 7(d) does not apply to revenues and expenditures of the E–470 Authority;

3. Whether the court of appeals erred in holding that even if Amendment [1] applies to the E–470 Authority, Section 4(b) does not apply to the E–470 Authority's plan to borrow $570,000,000 to build Segments II and III of the E–470 highway or to increases in revenue to repay that debt;

4. Whether the court of appeals erred in holding that Arapahoe County has delegated to the E–470 Authority all of its rights to the Series 1986 Arapahoe County Trust Fund Bonds and its rights in an alignment.

Recent events, however, have led to the withdrawal and dismissal of petitioners Arapahoe County Board and Jolly as parties so that Nicholl remains as the only petitioner. Therefore, before answering the questions posed by our order granting certiorari review, we first address the issue of whether Nicholl has standing to continue this suit. Concluding he has standing with respect to the first three certiorari issues only, we then will consider those questions alone.

## II.

The November 1994 general election occurred after our grant of certiorari and prior to oral arguments in this case. That election caused a change in the membership of the Arapahoe County Board of Commissioners. Although John Nicholl continues in office as one of three Arapahoe County Commissioners, petitioner Jeannie Jolly was not reelected and, as of January 10, 1995, she is no longer a commissioner. On January 12, petitioner Board of County Commissioners of Arapahoe County filed a motion to dismiss its claims, and on January 13, petitioner Jolly filed a Request to Withdraw as Petitioner. On January 19, we granted both the motion and request of those two parties and dismissed both petitioners from this proceeding. As a consequence, only Nicholl remains, challenging the judgment of the court of appeals.

On January 23, after hearing oral arguments of Nicholl and the Authority, we issued an order directing those remaining parties to submit briefs addressing a single question:

Whether petitioner John J. Nicholl has standing to warrant our further consideration of the fourth issue upon which we granted certiorari, that is "[w]hether the court of appeals erred in holding that Arapahoe County has delegated to the E–470 Authority all of its rights to the Series 1986 Arapahoe County Trust Fund Bonds and its rights in determining the alignment of the highway."

Having considered the submissions, we now answer that question.

■ First, we conclude that Nicholl does have standing as a Colorado taxpayer to determine whether the Authority is subject to Amendment 1 regulation. In *Wimberly v. Ettenberg,* 194 Colo. 163, 166, 570 P.2d 535, 538 (1977), this court set forth a two-part analysis for establishing standing. There we held:

> The two requirements which must be satisfied are: (1) the plaintiff must allege that the challenged action has caused him injury in fact, and (2) the interest sought to be protected must arguably be within the zone of interest to be protected or regulated by the statute in question.

*Id.* In consideration of the first requirement we note that taxpayers have standing to seek to enjoin an unlawful expenditure of public funds. *Dodge v. Department of Social Servs.,* 198 Colo. 379, 381, 600 P.2d 70, 71 (1979). Furthermore, even where no direct economic harm is implicated, a citizen has standing to pursue his or her interest in ensuring that governmental units conform to the state constitution. *Id.* at 382, 600 P.2d at 71–72. Nicholl, in both of these respects, satisfies the first requirement of *Wimberly* because he seeks review of what he claims is an unlawful government expenditure which is contrary to our state constitution.

Nicholl also has a legally protected interest. Amendment 1 clearly states that "[i]ndividual or class action enforcement suits may be filed and shall have the highest civil priority of resolution." Colo. Const. art. X, § 20(1). Because the issues for which we granted certiorari concern the enforcement of Amendment 1, Nicholl has standing, as expressly provided under Amendment 1, to bring this action as an individual taxpayer.

■ However, as to the question of whether Arapahoe County delegated its rights in determining the alignment of the E–470 highway, we find that Nicholl lacks standing to pursue this claim in his individual capacity as an Arapahoe County Commissioner. A county exercises its power by and through its board of commissioners, not through individual members. § 30–11–103, 12A C.R.S.

(1986); *Garfield Co. v. Leonard,* 3 Colo.App. 576, 580, 34 P. 583, 585 (1893) (holding that county commissioners are vested with full and sole power to manage the business affairs of the county) (disapproved on other grounds in *McGovern v. Board of Comm'rs,* 54 Colo. 411, 416, 131 P. 273, 275 (1913)). Section 30–11–103 provides that "[t]he powers of a county as a body politic and corporate shall be exercised by a board of county commissioners therefor." Moreover, our rules of statutory construction require that "[a] grant of authority to three or more persons as a public body confers the authority upon a majority of the number of members," § 2–4–110, 1B C.R.S. (1980), and hence a board of county commissioners must act jointly through a majority of its members and not by individual members. *See O'Gorman v. Industrial Claim Appeals Office,* 839 P.2d 1149 (Colo.1992). Accordingly, the Arapahoe County Board, and not an individual commissioner, is the appropriate representative to assert the interests of Arapahoe County. On its own initiative the Arapahoe County Board is no longer a party in this action. Thus, the claims made by the Board abated upon its withdrawal from the suit.

Hence, we conclude that Nicholl has standing as a taxpayer to challenge the actions of the Authority as contrary to Amendment 1 of our state constitution. Although Amendment 1, itself, did not create "rights" vested in Colorado's taxpayers but rather imposes "limitations on the spending and taxing power of state and local government," *Bickel v. City of Boulder,* 885 P.2d 215, 225 (Colo. 1994), under the terms of Amendment 1, Nicholl may bring an enforcement action as an individual taxpayer. However, Nicholl does not have standing to assert claims belonging to Arapahoe County. Because Arapahoe County is no longer a party and Nicholl cannot assert its claims, if any, we do not consider whether Arapahoe County properly delegated its rights to the Bonds or in the E–470 highway alignment. Accordingly, we dismiss as improvidently granted the fourth issue on certiorari.[8]

---

8. The court of appeals found that Arapahoe County had delegated all of its rights to the Bonds to the Authority under the 1988 Establish-

ing Contract. Because Nicholl does not have standing to challenge this holding in his individual capacity, we will treat the Bonds as obli-

We now turn to the remaining three questions under our order granting certiorari, relating to the taxation, spending and debt limitations and voting requirements of Amendment 1.

### III.

Nicholl asserts that under the debt and revenue limitations of Amendment 1, the Authority cannot continue to construct, maintain and operate the E–470 highway in accordance with the Establishing Contract and the PHA Law, as amended by H.B. 1316, without prior voter approval. The Authority counters that since it is an "enterprise," and not a "district," it is free from the limitations imposed by Amendment 1. Even if it were not an enterprise, the Authority argues that the Amendment 1 revenue and debt limitations do not apply to its financing plan.

To resolve this dispute, therefore, we must first decide whether the Authority is an "enterprise" exempt from Amendment 1 limitations. Because we find that the Authority is not an enterprise, we must then address whether the taxing and spending limitations of Amendment 1 apply to the Authority's plan to finance future construction and operation of the E–470 highway.

■ In reviewing alleged violations of the state constitution, we rely upon general rules of statutory construction. *Bickel,* 885 P.2d at 228 n. 10 (citing *Center for Pub. Interest Law v. Fair Political Practices Comm'n,* 210 Cal.App.3d 1476, 259 Cal.Rptr. 21, 26 (1989)). We must consider the terms of the constitutional provision itself and apply the constitutional provision according to its clear terms. *City of Aurora v. Acosta,* 892 P.2d 264, 267 (Colo.1995); *Carrara Place, Ltd. v. Arapahoe County Bd. of Equalization,* 761 P.2d 197, 202 (Colo.1988). We must give effect, if possible, to every word, *Charlton v. Kimata,* 815 P.2d 946, 949 (Colo.1991), and consider "the object to be accomplished and the mischief to be avoided" by the provision at issue. *People v. Y.D.M.,* 197 Colo. 403, 407, 593 P.2d 1356, 1359 (1979).

■ In addition to these general interpretational rules, Amendment 1 provides that "[i]ts preferred interpretation shall reasonably restrain most the growth of government." Colo. Const. art. X, § 20(1). We have interpreted this language to mean that "where multiple interpretations of an Amendment 1 provision are *equally supported* by the text of that amendment, a court should choose that interpretation which it concludes would create the greatest restraint on the growth of government." *Acosta,* 892 P.2d at 267 (emphasis added) (citing *Bickel,* 885 P.2d at 229. However, the proponent of an interpretation "has the burden of establishing that its proposed construction of Amendment 1 would reasonably restrain the growth of government more than any other competing interpretation." *Bickel,* 885 P.2d at 231.

### A.

#### Enterprise exemption

■ Amendment 1 requires "districts" to hold elections to obtain voter approval in advance for increases in taxes and spending and direct or indirect debt increases. Colo. Const. art. X, § 20(4). Amendment 1 defines "district" as "the state or any local government, *excluding enterprises.*" *Id.,* § 20(2)(b) (emphasis added). It is undisputed that the Authority is a governmental entity and thus qualifies as a district unless it is an enterprise. The dispute in this case concerns whether the Authority is an enterprise.

Amendment 1 defines an "enterprise" as "a government-owned business authorized to issue its own revenue bonds and receiving under 10% of annual revenue in grants from all Colorado state and local governments combined." *Id.,* § 20(2)(d). Recently, we held that "there is nothing novel or cryptic about either the term 'government' or 'business' and merely combining those otherwise commonly understood terms does not create an obscure meaning unknown to most voters." *Matter of Title, Ballot Title & Submission Clause,* 875 P.2d 871, 877 (Colo.1994). In determining whether the Authority is an "enterprise," then, we must determine

gations of the Authority rather than the County

for purposes of Amendment 1 analysis.

whether the Authority is both "government-owned" and a "business," given the ordinary meaning and understanding of these terms.[9]

The term "government-owned," as its plain language implies, is commonly used to indicate ownership by a governmental entity. *See State v. DeFoor*, 824 P.2d 783, 787 (Colo. 1992) ("government-owned" health care facility); *Bain v. Town of Avon*, 820 P.2d 1133, 1136 (Colo.App.1991) ("government-owned" motor vehicles); *Durbin v. Bonanza Corp.*, 716 P.2d 1124, 1128 (Colo.App.1986) (government ownership of land tract). In this case the Authority's organizational structure is consistent with ownership by a governmental entity. The Establishing Contract defines the Authority as "a body corporate and political subdivision of the State of Colorado created pursuant to this Contract and the Act."[10] Under the Establishing Contract, the Authority is a joint venture of governmental units organized and established for the purpose of operating and maintaining a fee-for-service tollway. The Authority is under the control of a board of directors which holds "all legislative power of the [E-470] Authority." The Establishing Contract further provides for a board of directors, each of whom must be "throughout such Director's tenure ... an elected official of the legislative or governing body of such Governmental Unit." In addition, the assets of the Authority are to be distributed only to "each Governmental Unit" based on "where the assets are situated" and "on an equitable basis." Because both ownership and control of the Authority therefore are with the participating governments, we conclude the Authority is a "government-owned" entity.

The term "business" is generally understood to mean an activity which is conducted in the pursuit of benefit, gain or livelihood. *See Lindner Packing & Provision Co. v. Industrial Comm'n*, 99 Colo. 143, 147, 60 P.2d 924, 926 (1936) (occupation for livelihood or profit, activity, energy, capacity, that which busies or occupies the time, attention or labor of one, everything about which a person can be employed). In this case, the Authority was organized with the express intent that it function as the operator of a limited access highway—that it grant access to its public roadway in exchange for the payment of a toll and user fees. In accordance with its Establishing Contract and enabling statutes, the Authority carries on its activities with the specific purpose of financing, constructing, operating and maintaining the E-470 highway as a fee-for-service tollway. § 43-4-506(1)(d), (f), 17 C.R.S. (1993). In this capacity, the Authority generates revenue by collecting tolls directly from E-470 highway users. The Authority in turn uses the toll proceeds, along with investment income, to finance the construction and maintenance of the E-470 highway. By providing access to a public roadway in exchange for the payment of tolls and user fees, the Authority is engaging in an activity conducted in the pursuit of benefit, gain or livelihood and, in these respects, fits the definition of a "business."

However, while the Authority is "business-like" in these respects, it has authority to finance its operations in a manner not typical of a "business" as the term is commonly used. In addition to tolls and vehicle registration fees, the Authority has the power to levy a sales or use tax "upon every transac-

**9.** Nicholl argues that our decision in *In re Submission of Interrogatories on Senate Bill 93–74*, 852 P.2d 1 (Colo.1993), requires a determination of whether the activities of the entity under consideration are "essentially governmental in nature." If they are, he argues, the entity cannot qualify as an "enterprise" under the Amendment 1 definition. Nicholl misreads our analysis in that case, however. In that case, we found that Great Outdoors Colorado, Inc. was "decidedly not a private entity. Nor is it as presently constituted an 'enterprise' under Amendment 1." *Id.* at 10. Thus, the narrow question before us was whether Great Outdoors Colorado was a "district" under Amendment 1, not whether it was an "enterprise." In that limited context, we held

that entities that are "essentially governmental in nature" are "districts" subject to the strictures of Amendment 1. *Id.* Because Nicholl's interpretation of "enterprise" is not supported by the text of the amendment, we need not consider it further.

**10.** The original Memorandum of Understanding entered into by the members of the E-470 Agency on August 1, 1986, defined the E-470 Agency as "a separate legal entity of the State of Colorado, established by agreement of the Participating Governments pursuant to the Cooperation Act" of the Colorado Constitution.

tion or other incident with respect to which a sales or use tax is levied by the state"; establish an employment tax; and establish "a tax on the privilege of conducting any trade, business, occupation, or profession" in order to finance its activities. § 43–4–506(1)(*l*), (m) & (n), 17 C.R.S. (1993). The ability to levy general taxes is inconsistent with the characteristics of a business.

We recognize that the Authority has not yet exercised its taxing powers. Nevertheless, the financing agreement between Arapahoe County and the Authority for the roll-out of escrowed funds to begin the next phase of construction explicitly provides that the repayment of funds is secured by "Authority Revenues." The definition of "Authority Revenues" includes all of the sources of revenue authorized in the statute:

all amounts received by the Authority from:

... (iii) *sales and use taxes imposed by the Authority pursuant to Section 43–4–506(1)(l)* of the Public Highway Authority Law; (iv) *taxes on the privilege of employment imposed by the Authority pursuant to Section 43–4–506(1)(m)* of the Public Highway Authority Law; (v) *taxes on the privilege of conducting any trade, business, occupation or profession* imposed by the Authority pursuant to Section 43–4–506(1)(n) of the Public Highway Authority Law; (vi) Vehicle Registration Fees; ....

The status of the Authority for purposes of the application of Amendment 1 strictures cannot depend on whether at any particular point in time the Authority has or has not exercised the powers available to it, especially when those revenue raising powers are an integral part of its financing agreements.

Further, including a taxing authority within the Amendment 1 definition of "enterprise" is also inconsistent with the terms of the definition considered as a whole. The third prong of the "enterprise" definition

prohibits a qualifying entity from receiving more than "10% of its annual revenue *in grants* from all Colorado state and local governments combined." Colo. Const. art. X, § 20(2)(d) (emphasis added). The purpose of this restriction must be to distinguish a purported enterprise from a governmental unit. If an entity has the power to impose taxes on the same transactions taxable by the state and local government, limiting its receipt of "grants" from those entities would be unnecessary because an enterprise could simply raise its revenues independently from the same sources. Accordingly, we conclude that the limitation on revenues from "grants" in the definition of "enterprise" is inconsistent with the independent power to levy taxes.

Thus, we conclude that the power to unilaterally impose taxes, with no direct relation to services provided, is inconsistent with the characteristics of a business as the term is commonly used.[11] Nor is it consistent with the definition of "enterprise" read as a whole. Accordingly, we hold that the Authority is a district subject to the voter approval provisions of Amendment 1.

### B.

### Section 4(b)

Since we hold that the Authority is subject to the provisions of Amendment 1, we first address whether the Authority's plan to finance the next phase of construction of the E–470 highway creates a financial obligation for which voter approval is required. The court of appeals found that "releasing the 1986 bond proceeds from escrow does not create any new debt, impose any tax, or expose the taxpayers to any new liability or obligation" and, thus, is not subject to the voter approval requirements of Amendment 1, section 4(b). *See E–470 Public Highway Authority,* 881 P.2d at 419. The court based its holding on two grounds. First, it found

---

11. Several entities which have filed as amicus curiae in this case allegedly rely on enterprise status to issue revenue bonds without voter approval. It appears that none of these entities is authorized to impose taxes to finance its capital construction or the services it provides. *See* § 25–29–112, 11A C.R.S. (1994 Supp.) (Denver Health & Hospital Authority); § 25–25–107, 11A C.R.S. (1989) (Colorado Health Facilities Authority); §§ 31–25–105, –113, –807, –906, 12B C.R.S. (Urban Renewal Authorities); Denver Revised Municipal Code §§ 20–17, –18 (Denver International Airport); Title 40, 17 C.R.S. (1993 & 1994 Supp.) (municipal utilities). We express no opinion concerning whether these entities qualify as enterprises, however.

that "the principal amount of the debt, the security for the bonds, and the repayment mechanism for the bonds have remained the same since the initial issuance in 1986." Thus, the remarketing scheme did not create any new obligation to which the voter approval requirement of section 4(b) applies. Second, the court found that the Bonds were not subject to section 4(b) because the Bonds did not impose a debt or liability on Arapahoe County because they are payable from identified revenue sources, not general tax revenues. *Allardice v. Adams County,* 173 Colo. 133, 139, 476 P.2d 982, 985 (1970) (holding that revenue bonds do not create "debt" for purposes of article XI, section 1 of the Colorado Constitution). We agree with the court of appeals' conclusion.[12]

Nicholl contends that the remarketing of Bonds in 1993, in conjunction with releasing the bond proceeds from escrow, constitutes new debt to which the Amendment 1 election requirements of section 4(b) apply. While this remarketing might not constitute "debt" under pre-Amendment 1 case law cited by the court of appeals, Nicholl argues that Amendment 1 expands the type of debt requiring voter approval to any "other financial obligation whatsoever." Nicholl contends that the remarketing scheme detailed in the Authority's Plan of Finance creates new financial obligations because the terms of the bondholder agreements will be different. He also argues that the debt incurred by the Authority as a result of loans from the Colorado Department of Transportation, constituent localities, and the Authority's contractor is subject to the voter approval requirement of this section because it results in the creation of new multi-year fiscal obligations to repay that debt.

Amendment 1, section 4(b) states:

Starting November 4, 1992, districts must have voter approval in advance for:

. . . .

(b) *Except for refinancing district bonded debt at a lower interest rate* or adding new employees to existing district pension plans, *creation* of any *multiple-fiscal year*

*direct or indirect district debt or other financial obligation whatsoever* without adequate present cash reserves pledged irrevocably and held for payment in all future fiscal years.

Colo. Const. art. X, § 20(4)(b) (emphasis added).

We agree with Nicholl that, unlike the provision of Article XI considered in *Allardice,* the plain language of Amendment 1 applies to revenue bonds. The restrictions imposed by section (4)(b) apply to direct and indirect debt and any "other financial obligation whatsoever" without distinction among the possible methods of securing and repaying that debt. This interpretation also is consistent with the Amendment read as a whole. Section 1 suspends tax and spending approval requirements only "[w]hen annual district revenue is less than annual payments on general obligation bonds, pensions, and final judgments." *Id.,* § 20(1). This description includes obligations not commonly treated as "debt" and thus indicates that Amendment 1 was intended to encompass a broad scope of financial obligations not limited to general obligation bonds. It follows from this interpretation that both the Bonds and the intergovernmental loans are financial obligations under the terms of Amendment 1.

However, while the Bonds constitute a financial obligation under Amendment 1, the remarketing of the Bonds nevertheless is not subject to section 4(b). The bond remarketing scheme does not *create* any *new* obligation, it merely remarkets debt that was authorized before the enactment of Amendment 1 under the terms of a financing plan adopted at the time the debt was issued. Furthermore, the terms under which refinancing would occur were specified in the original bond agreements that were also issued before Amendment 1 was enacted. Thus, even if remarketing of the Bonds required the payment of a higher interest rate than previously paid, that increase was authorized at the time the initial bond issue was approved. Accordingly, we hold that the voter approval requirements of section 4(b) do

---

12. The court of appeals did not address the applicability of Amendment 1 to the intergovern-mental loans.

not apply to the portion of the refinancing plan that calls for releasing the Bond proceeds out of escrow and remarketing the bonds.

■ With respect to the intergovernmental loans, the Authority contends that even if the loans are "debt" under Amendment 1, they likewise are not covered by section 4(b). The Authority contends that, under *Board of County Comm'rs v. Dougherty*, 890 P.2d 199 (Colo.App.1994), loans such as these, which are contingent on an annual appropriation of the loan amount by state and local government entities, are not a "multiple-fiscal year" financial obligation to which section 4(b) applies. We disagree.

*Dougherty* addressed whether a leaseback agreement between Boulder County and a bank constituted a financial obligation for which voter approval was necessary under section 4(b). The agreement provided that the bank would purchase certain equipment, transfer its rights as a lessor of the equipment to a trust in which third parties could purchase certificates of participation. The certificate holders were then entitled to receive revenue from the lease of the equipment to the county. The lease agreement provided for an initial eight-month term and the option to renew for four subsequent one-year terms. After conclusion of the final renewal term, title to the equipment would pass to the county. The court of appeals held that because the county had the option to renew the lease or not at the end of each term, the agreement did not constitute a multi-year fiscal obligation subject to section 4(b). *Id.* at 206.

*Dougherty* does not apply to this case, however. While the obligation of the creditor governments to *make* the loans may be subject to annual appropriations, the obligation of the Authority to *repay* the loan amounts is not, and that obligation is likely to extend beyond the year of the actual loan.[13] Furthermore, the bonds to be issued by the Authority to secure this repayment obligation will be issued subsequent to the enactment of Amendment 1. Accordingly, the loan repayment is a new multi-year fiscal obligation and the Authority must obtain voter approval before incurring this debt.

### C.

#### Section 7(d)

■ We next consider whether the collection and expenditure of revenues by the Authority as part of its financing plan requires voter approval under Amendment 1. The court of appeals held that the collection and spending of revenues by the Authority for the operation and maintenance of the E–470 highway and the payment of the Bonds was outside the scope of "state fiscal year spending" to which election requirements under section 7(d) apply. The court found that because the Authority revenues deposited in the county trust fund are encumbered to pay the principal and interest on the Bonds and E–470 operating expenses, the county has no discretion to spend these funds under sections 30–26–504(4)(a) and (b), 12 C.R.S. (1986).[14] Because these funds have been so encumbered since the original issuance of the bonds in 1986, and since "it was inherent within the bond contracts that future revenues would be received and spent by the Authority for the purpose of operating the highway and repaying the indebtedness," the court held that these revenues and expenditures are outside the scope of Amendment 1. *E–470 Public Highway Authority*, 881 P.2d

---

**13.** The record indicates that the repayment terms of these loans have not yet been finalized.

**14.** Sections 30–26–504(4)(a) and (b) provide:
(4) The board of each county for which a county capital improvement trust fund is created may:
  (a) Appropriate moneys on deposit in the county capital improvement trust fund of such county for any lawful county project, to the extent that such funds are not otherwise encumbered;

  (b) Allocate and distribute among any political subdivisions within such county all or any portion of the county capital improvement trust fund of such county for the purpose of assisting any capital improvement to be undertaken by any such political subdivision, to the extent that such funds are not otherwise encumbered; . . . .
§ 30–26–504(4)(a) & (b), 12A C.R.S. (1986). Part 5, sections 30–26–501 to –513 is entitled "County Capital Improvements Trust Fund."

at 420. We again agree with the court of appeals' conclusion.[15]

Under Amendment 1, section 20(7)(d):

If *revenue* from sources *not excluded from fiscal year spending* exceeds [the limits established by section (7)(b) ] in dollars for that fiscal year, the excess shall be refunded in the next fiscal year unless voters approve a revenue change as an offset.

Colo. Const. art. X, § 20(7)(d) (emphasis added). Section (7)(b) provides that:

[t]he maximum annual percentage change in each local district's fiscal year spending equals inflation in the prior calendar year plus annual local growth adjusted for revenue change approved by voters after 1991....

*Id.,* § 20(7)(b).

"Fiscal year spending" is defined as:

all district expenditures and reserve increases *except*, as to both, those for refunds made in the current or next fiscal year or those from gifts, federal funds, collections for another government, pension contributions by employees and pension fund earnings, reserve transfers or expenditures, damage awards, or property sales.

*Id.* § 20(2)(e) (emphasis added). Section 20(7)(d) also excludes from the definition of fiscal year spending, "[d]ebt service changes [and] reductions" and "voter approved revenue changes."[16] The section specifies that creation of bonded debt "shall increase, and retiring or refinancing district bonded debt shall lower, fiscal year spending and property tax revenue by the annual debt service so funded." *Id.,* § 20(7)(d).

Under Amendment 1, then, bonded debt increases annual fiscal spending only by the amount of the debt service, not by the amount of the borrowed funds expended. Thus, *the expenditure of the escrowed bond proceeds for further construction and the operation of E–470 highway does not impact annual fiscal spending, and is not subject to the voter approval requirements of section 7(d).* Moreover, amounts expended each year to service the Bonds were part of the district base at the time Amendment 1 took effect, as are amounts collected from tolls and vehicle registration fees and therefore do not reflect an increase in annual spending.[17]

---

**15.** Contrary to Nicholl's assertion, the court of appeals' conclusion that the collection of fees and tolls to service the E–470 Bonds did not require voter approval was not inconsistent with our holding in *In re Submission of Interrogatories on SB 93–74*, 852 P.2d 1. In that case, we held that the General Assembly had reconciled the implicit conflict between Amendment 1 and Amendment 8 by exempting from "state fiscal year spending" lottery proceeds that are dedicated to the Conservation Trust Fund, the Division of Parks and Outdoor Recreation and the Great Outdoors Colorado Trust Fund, but including those proceeds dedicated to the Capital Construction Fund for payment of debt service and to the general fund. *Id.* at 11. We did not hold that the collection and expenditure of those funds required voter approval, as is the question in this case.

**16.** The full text of this exception reads: "Debt service changes, reductions, [excess revenue] refunds, and voter-approved revenue changes are dollar amounts that are exceptions to, and not part of, any district *base*." Colo. Const. art. X, § 20(7)(d) (emphasis added). The term "base" in this context refers to the prior year's fiscal year spending, since the prior year's spending acts as the "base" for determining allowable spending the following year. These dollar amounts must be excluded in "fiscal year spend-

ing" when calculating spending during the current year as well as when calculating spending during the prior year in order to determine the percentage change in fiscal year spending for purposes of imposing spending limitations under § 7(b).

**17.** While section 7(d) explicitly provides that "creation of bonded debt shall increase ... fiscal year spending ... by the annual debt service so funded," the parties have not argued that any increase in debt service resulting from intergovernmental loans to the Authority from the State and constituent local governments constitutes an increase in fiscal year spending subject to voter approval. We note, however, that Amendment 1 requires both election notices and ballot titles to include not only the principal amount of proposed debt, but also the annual maximum repayment cost of that debt, i.e. the debt service. *See* Colo. Const. art. X, § 20(3)(b)(iv), (c). Thus, by requiring voter approval to incur the debt, Amendment 1 also requires voter approval of the increase in fiscal year spending created by service on that debt. Accordingly, it is not necessary to determine whether, or in what circumstances, section (7) would independently require voter approval of increased spending for this debt service. Certainly, if the Authority now were to attempt to collect another form of revenue pursuant to the revenue-raising powers au-

Accordingly, the only question is whether Amendment 1 applies to the collection and expenditure of tolls and other revenue to service the Bonds after the bond proceeds have been broken out of escrow.

The collection and expenditure of Authority revenues for service on the Bonds are "changes in debt service,"[18] to which the provisions of section 7(b) do not apply under the plain language of the Amendment. The language of the subsection excludes "changes" and "reductions" in debt service from fiscal year spending. The amounts to be expended in servicing the Bonds after release of the bond proceeds from escrow do not change from that contemplated when the bonds were issued in 1986. The only change will be the source of revenue to fund that debt service which will no longer be funded by the initial bond proceeds. Thus, the collection and expenditure of those revenues for debt service does not constitute an increase in fiscal year spending, but merely a "change in debt service."

This interpretation is the only practical interpretation of the exception for "debt service changes" from Amendment 1's voter approval requirements. Limitations on fiscal year spending must accommodate arrangements that allow for changing sources of revenue to service the debt incurred in financing capital projects over the life of that debt.[19] To do otherwise might result in "debt without the revenue to repay that debt," *see Bickel,* 885 P.2d at 231 n. 13, or thwart the completion of projects for which voters already had approved the incurrence of debt if voters subsequently failed to approve a change in revenue source for continued debt service.

Furthermore, in this case there was actual voter approval of the collection of a vehicle registration fee to fund the E–470 highway in November of 1988.[20] Because the ballot strictures of Amendment 1, which require a district to estimate the maximum dollar amount of a tax increase and require refunds of excess revenues over that amount, were not in place at the time of the election in 1988, we must assume that, when the voters authorized the Authority to levy the fee "for the purpose of assisting in the financing of the E–470 beltway," they also authorized the Authority to spend for that purpose whatever revenues it collected. Any increase in revenue collected over that generated by the bond proceeds is therefore a "voter approved revenue change" and need not be approved again.

IV.

In summary, we find that the taxation powers granted to the Authority under the Public Highway Authority Act are inconsistent with the characteristics of a "business." Thus, we hold that the Authority is a district subject to the voter approval requirements of Amendment 1 and does not fall within the "enterprise" exception.

Although the Authority is subject to Amendment 1, we hold that the portion of the Authority's 1993 Plan of Finance which includes remarketing the Bonds, releasing the bond proceeds from escrow, and collecting tolls and vehicle registration fees to secure the reissued bonds and fund E–470 operating expenses, is not subject to Amendment 1's voter approval requirements under sections 4(b) and 7(d). Nevertheless, we find that the intergovernmental loans under the financing plan constitute a multi-year fiscal

thorized under the Public Highway Authority Law, §§ 43–4–501 to –522, 17 C.R.S. (1993 & 1994 Supp.), the Authority would be required to seek voter approval for both the collection and expenditure of those funds.

18. *See* discussion *supra* n. 16.

19. This is especially true where, as the trial court found here, the debt repayment mechanism and security for the bonds has remained the same as initially specified when the bonds were issued in 1986.

20. The ballot question approved in that election read as follows:

Shall the E–470 Public Highway Authority, having determined the need for additional highway capacity to help reduce traffic congestion in the metro area, be authorized to levy a motor vehicle registration fee of not more than ten dollars per year on each motor vehicle registered by persons residing within portions of Adams, Arapahoe, and Douglas Counties, for the purpose of assisting in the financing of the E–470 beltway?

obligation which may be undertaken by the Authority only pursuant to section 4(b) voter approval.

The judgment of the court of appeals is affirmed in part and reversed in part. The case is returned to the court of appeals for remand to the district court for further proceedings consistent with this opinion.

ERICKSON, J., concurs in part and dissents in part, and KIRSHBAUM, J., joins in the concurrence and dissent.

SCOTT, J., does not participate.

Justice ERICKSON, concurring in part and dissenting in part:

I would affirm the court of appeals decision in *Board of County Commissioners v. E–470 Public Highway Authority*, 881 P.2d 412 (Colo.App.1994). I concur with the majority's affirmance that the debt and revenue expenditures in this case that were approved by the voters prior to the effective date of Amendment 1 are not subject to the election requirements of Amendment 1. I also agree that John L. Nicholl has no standing to commence an action "in his individual capacity as an Arapahoe County Commissioner." Maj. op. at 866. However, I do not agree that the repayment obligations undertaken by the E–470 Public Highway Authority (Authority) since the effective date of Amendment 1 are subject to its voter approval requirements. *See* maj. op. at 861. The court of appeals properly held that, because the Authority "is an 'enterprise' and not a 'district,' the ... Authority is *not* subject to the election provisions of Colo. Const. art. X, § 20 (Amendment [1] )." *E–470 Public Highway Authority*, 881 P.2d at 414–15.

The majority concludes that the Authority is not an enterprise because, "[t]he power to unilaterally impose taxes, with no direct relation to services provided, is inconsistent with the characteristics of a business as the term is commonly used." Maj. op. at 869. I disagree with the majority because the Authority is a government-owned business and therefore an "enterprise" as the term is defined in Amendment 1. Accordingly, I would hold that, because the Authority is an enter-

prise, it is not subject to the election requirements of Amendment 1.

Amendment 1 requires voter approval for increases in taxes and spending and direct or indirect debt increases for those entities that constitute "districts." Colo. Const. art. X, § 20(4). The term "district" is defined in Amendment 1 as "the state or any local government, excluding enterprises." *Id.* § 20(2)(b). Amendment 1 defines an enterprise as "a government-owned business authorized to issue its own revenue bonds and receiving under 10% of annual revenue in grants from all Colorado state and local governments combined." *Id.* § 20(2)(d).

The Public Highway Authority Law governs the creation and powers of the Authority. *See* §§ 43–4–501 to –522, 17 C.R.S. (1993). Pursuant to section 43–4–509, 17 C.R.S. (1993), the Authority is authorized to issue its own revenue bonds. At trial, evidence was introduced that over ninety percent of the Authority's revenue comes from the collection of tolls and vehicle registration fees. Consequently, the Authority receives less than ten percent of its annual revenue in grants. Because the Authority may issue its own revenue bonds and receives less than ten percent of its annual revenue in grants, the remaining issue is whether the Authority constitutes a government-owned business.

I agree with the majority's conclusion that the Authority is a government-owned entity. *See* maj. op. at 864. However, I disagree with the majority's conclusion that the Authority is not a business for purposes of Amendment 1.

A

The term "business" has been defined in a number of ways by lexicographers and courts. *Lindner Packing & Provision Co. v. Industrial Comm'n*, 99 Colo. 143, 145, 60 P.2d 924, 925 (1936). Generally, "business" has been defined as an activity that is conducted in the pursuit of benefit, gain, or livelihood. *See id.* at 147, 60 P.2d at 926. When construed in statutes or in specific instruments, the meaning of "business" "has been held to depend upon the context, the facts of the particular case, the intention of

the parties, or upon the purposes of the legislation." 12A C.J.S. Business 464 (1980) (footnote omitted); *see generally* 5A Words and Phrases Business 601–02 (1968).

The Authority was created for the specific purpose of financing, constructing, operating, and maintaining the E–470 highway as a fee-for-service tollway. § 43–4–506(1)(d), (f), 17 C.R.S. (1993). The Authority generates revenue by collecting tolls directly from E–470 users and uses the revenue to finance and maintain the highway. By allowing access to the highway in exchange for user fees, the Authority is engaging in a business.

The Authority has the power to levy a sales or use tax, establish an employment tax, and create "a tax on the privilege of conducting any trade, business, occupation, or profession" to finance its activities. § 43–4–506(1)(*l*)–(n), 17 C.R.S. (1993). The sales or use tax may not "exceed four-tenths of one percent upon every transaction or other incident with respect to which a sales or use tax is levied by the state." § 43–4–506(1)(*l*). The employment tax and the tax on the privilege of conducting a trade or business may not exceed the rate of two dollars each month per person affected. The majority states that the Authority's unilateral power to impose taxes is inconsistent with the typical characteristics of a business. Maj. op. at 869.

The majority fails to consider that the term "business" is modified by "government-owned." Because the definition of "business" varies with the context, the meaning of the term "business" must not be analyzed in isolation, but must be determined in the context of the surrounding words. The fact that the Authority has the ability to raise revenue through taxes does not automatically disqualify the Authority from constituting a government-owned business.

The Authority is designed to be supported solely by toll revenues. Section 43–4–502(1)(d) provides:

> It is the intention of the general assembly that a beltway developed pursuant to this part 5 shall ultimately be supported by tolls and that, therefore, it is the intention of the general assembly that revenue-raising powers other than tolls, granted by this part 5 to authorities . . . shall be terminated at such time as the boards of the authorities determine that projected tolls will be sufficient to meet the authorities' obligations to their bondholders and to operate and maintain such beltways. . . .

The Authority is primarily a business because it provides a service for a fee and is designed to be self-supporting. The Authority's ability to tax, which it has not yet exercised, is incidental to its primary function of operating a fee-for-service tollway.

## B

The majority states that the purpose of the restriction requiring an enterprise to receive less than ten percent of its annual revenue from state and local governments is to distinguish an enterprise from a governmental unit. Maj. op. at 869. If an entity has the power to impose taxes on the same transactions that are taxable by state and local governments, the ten percent restriction is unnecessary, according to the majority, because an enterprise could independently raise revenue by taxing the same sources. *Id.*

The purpose of the ten percent restriction cannot be to distinguish an enterprise from a governmental unit because an enterprise is, by definition, a "government-owned business." Colo. Const. art. X, § 20(2)(d). The ten percent restriction must be read in conjunction with the requirement that an entity have the authority to issue its own revenue bonds and be a government-owned business in order to constitute an enterprise. *See id.* Read in conjunction, the purpose of these requirements is to exempt a government-owned, but independent business from Amendment 1. Although government-owned, an enterprise has the autonomy to issue its own revenue bonds, and is not reliant on government grants to function.

The Authority operates as a fee-for-service business, receives more than ninety percent of its revenues from tolls and vehicle registration fees, and is designed to be self-supporting. The fact that the Authority may also levy taxes does not undermine its independence or the ten percent requirement.

The Authority's ability to levy taxes is separate from the requirement that it receive less than ten percent of its revenue from state and local governments and does not preclude the Authority from constituting an enterprise that is exempt from Amendment 1.

Accordingly, I would hold that the Authority constitutes an enterprise for purposes of Amendment 1, and is not subject to the election requirements of Amendment 1.

KIRSHBAUM, J., joins in this concurrence and dissent.