Do any of the provisions of Senate Bill 96-60 or Senate Bill 96-193 constitute a "tax policy change" for purposes of TABOR?
 A. Yes. Some of the provisions of the bills result in tax policy changes in the Enterprise Zone Act for the purposes of TABOR.
Because provisions of the bills at issue constitute tax policy changes, do the changes directly cause a net tax revenue gain to any district?
 A. That question cannot be answered in this opinion. There would have to be a good faith analysis of the fiscal impact of any tax policy change to determine factually and economically whether it causes a net tax revenue gain.
In order to assist in the performance of the good faith analysis of the fiscal impacts of tax policy changes made by the bills at issue, we must answer one further question:
Would voter approval be required, even though a tax revenue gain to any district directly caused by a particular tax policy change is offset by a reduction in the district's tax revenue due to another tax policy change in the bill?
 A. No. TABOR requires voter approval only if there is a tax policy change which directly causes a net tax revenue gain to any district.
 ANALYSIS
In construing TABOR, the Colorado Supreme Court has held that its goal is to determine and give effect to the will of the people in adopting the constitutional amendment.[1]
In another action, the Court found that TABOR was presented to the voters, and presumably voted in, to give citizens protection from unwarranted tax increases.[2] With this background, we must attempt to determine the meaning of a key phrase in TABOR, specifically, the term "tax policy change". TABOR does not define the term. The Colorado Supreme Court directs us to give undefined terms their ordinary and popular meaning in interpreting the law. In addition, for terms not defined by constitutional provisions, the Court will rely upon prior case law.[3]
For purposes of this Opinion, then, we turn to popular usage and case law to first determine the meaning of the words "tax" and "policy," as used in the constitution. Having determined the meaning of those terms, we can then define the term "tax policy change".
In distinguishing property taxes and excise taxes from other governmental charges, several Colorado cases have held that these taxes are imposed to defray general governmental expenses.[4] Thus, under this analysis, a pecuniary charge imposed by the government to defray general governmental expenses appears to be a "tax". Therefore, a property tax and any state tax credited to the state general fund to be used for general governmental purposes, such as a state sales and use tax,[5] a state income tax,[6] and a state insurance premium tax,[7] is a "tax" for purposes of TABOR.
According to the generally-accepted law dictionary, "the term `policy,' as applied to a statute, regulation, rule of law, course of action, or the like refers to its probable effect, tendency or object, considered with reference to the social or political well-being of the state." Black's LawDictionary (4th ed.) (defining "public policy"). Thus, policy is the overall goal or object of the government, rather than the means by which the goal or object is achieved.[8] The phrase "tax policy," then, refers to the general principles by which a government is guided in its management of public affairs through the imposition of a tax.
A change in tax policy occurs when a statutory modification is made to the standards or rules governing the imposition of a specific tax. For example, a modification might be made to the subject of a tax, the timing of a tax, or the determination of liability under a tax. If a change does not modify the standards or rules regarding the imposition of a tax, no tax policy is being changed.
Having defined the term "tax policy change," we must now turn to Senate Bills 96-60 and 96-193 to determine whether they effectuate such a change in tax policy. The stated objective of the General Assembly in the Enterprise Zone Act was stated as follows:
 In order to provide incentives for private enterprise to expand and for new businesses to locate in such economically depressed areas and to provide more job opportunities for residents of such areas, to establish a pilot program for tax incentives and other assistance for enterprises in designated areas to be known as enterprise zones.
All of the incentives currently authorized under the Act provide either a tax credit or a tax exemption.[9]
Thus, the Enterprize Zone Act clearly sets out tax policy for the State of Colorado.[10]
Having determined that the Enterprise Zone Act is a "tax policy," we must next determine: (1) whether the Senate bills at issue here effect a change in that policy; and (2) if a change is effected, whether the change directly causes a net tax revenue gain. We first find that provisions of the bills do effect a tax policy change.
Because of the scope of the changes made by Senate Bills 96-60 and 96-193, we must conclude that the proposed modifications go beyond mere clarification of an existing policy. Rather, provisions of the bills modify the rules regarding imposition of a tax. This being the case, the bills constitute substantive changes to the Enterprise Zone Act. In effectuating substantive changes to the Act, the bills result in tax policy changes.
Having determined that the proposed legislation amounts to a tax policy change, it must then be determined under TABOR whether such change directly causes a net tax revenue gain to any district. If there is such a gain, voter approval is required.[11]
The most reasonable approach to determine whether any tax policy change directly causes a "net tax revenue gain to any district" would be to analyze the fiscal impact of such change. The goal of that analysis would be to determine, factually and economically, whether the tax policy change would result in a net tax revenue gain. This analysis would require a good faith calculation of projected revenue gains and reductions caused by the change. If such a good faith effort is made, it is unlikely that the courts would require the state to refund revenues, in the event that the calculation proves incorrect.[12]
In performing the fiscal impact analysis on a tax policy change, the overall effect of the change is determinant. Specifically, the provisions of each proposed bill must be viewed as a coherent whole, with the various tax revenue and decrease provisions of the bills being viewed as parts of the whole. For example, if a tax revenue gain in one bill provision is offset by a reduction in tax revenues in another provision of the bill, there is no net tax revenue gain, and, thus, no approval required under TABOR.
We must point out, however, that an "offsetting" provision must be functionally related to the new tax policy. A tax policy change cannot achieve revenue neutrality through the offset of taxes which are not an integral part of the tax policy in question.
CONCLUSION
Senate Bill 96-60 and Senate Bill 96-193 contain provisions which change the tax policy as currently set forth in the Urban and Rural Enterprise Zone Act. A good faith analysis is required of the fiscal impact of such tax policy change to determine whether it directly causes a net revenue gain which would require voter approval.
 Sincerely, GALE A. NORTON Attorney General
 MERRILL SHIELDS Deputy Attorney General
 MAURICE G. KNAIZER Deputy Attorney General
LEGISLATIVE BRANCH General Assembly TAX POLICY CHANGE — Amendment #1 (TABOR) ENTERPRISE ZONES NET TAX REVENUE GAIN — Amendment #1 (TABOR)
[1] Bolt v. Arapahoe County School District NumberSix, 898 P.2d 525 (Colo. 1995).
[2] Submission of Interrogatories on Senate Bill93-74, 852 P.2d 1 (Colo. 1993).
[3] Bickel v. City of Boulder, 885 P.2d 215 (Colo. 1994); Nicholl v. E-470 Public Highway Authority,896 P.2d 859 (Colo. 1995).
[4] "An ad valorem tax is a tax upon various classes of real and personal property. . . . Its purpose is to provide revenues in order to defray the general expenses of government. . . . The object of an excise tax, like an ad valorem tax, is to provide revenue for the general expenses of government, but unlike property tax, the payment of the excise tax is made a condition precedent to the act, event, or occurrence on which the tax is based." Bloom v. City of Ft. Collins, 784 P.2d 304,307 (Colo. 1990). See, also, WesternHeights Land Corp. v. City of Ft. Collins, 362 P.2d 155,146 Colo. 464 (1961); Cherry Hills Farms, Inc. v. City of CherryHills Village, 670 P.2d 779 (Colo. 1983); Zelinger v.City and County of Denver, 724 P.2d 1356 (Colo. 1986);Westrac v. Walker Field, Colorado, Public AirportAuthority, 812 P.2d 714 (Colo. 1991).
[5] The majority of revenues generated by the state sales and use tax are credited to the state general fund pursuant to § 7 of article XXIV of the State Constitution and § 39-26-123, C.R.S.
[6] State income tax revenues are credited to the state general fund pursuant to § 39-22-623, C.R.S.
[7] State insurance premium tax revenues are credited to the state general fund pursuant to § 10-3-209(4), C.R.S.
[8] Webster's Third New International Dictionary
(1986) defines "policy" to be "a definite course of action or method of action selected (as by a government, institution, group or individual) from among alternatives and in light of given conditions to guide and determine present and future decisions."
[9] Nine different incentives are currently authorized under the Act:
 A 3% state income tax credit for investment in equipment used exclusively in an enterprise zone;
 A $500 per job state income tax credit for new or expanding business facilities hiring new employees;
 An additional $500 per job state income tax credit for employees who add value to agricultural commodities through processing or manufacturing;
 A $200 per job state income tax credit for new employees who are insured under a qualifying health insurance program;
 A 3% state income tax credit for any taxpayer increasing research and development expenses in an enterprise zone;
 A 25% state income tax credit for the cost of rehabilitating a vacant commercial building located in an enterprise zone;
 A 50% state income tax credit for contributions to zone administrators for programs and activities that improve the economic condition of the zone;
 A state sales and use tax exemption for purchases of more than $500 of manufacturing machinery or tools; and
 Authority for local governments to offer incentives payments or credits based upon property tax liability or to offer refunds of local sales tax paid on purchases of equipment, machinery, tools, or supplies.
[10] In furtherance of this tax policy, the legislature established specific criteria for establishment of zones and tax credits.
Under the Act, a maximum of 16 enterprise zones may be designated. To be designated an enterprise zone, an area must have a population of no more than 50,000 people and one of the following:
an unemployment rate at least 25 percent above the state average;
a population growth rate less than 25 percent of the state average;
a per capita income less than 75 percent of the state average.
[11] A tax policy change may cause individual taxpayers' taxes to vary without requiring an article X, § 20 election.
[12] In Bickel, supra, the Colorado Supreme Court announced several non-exclusive factors which a court should consider in determining whether a district has "substantially complied" with TABOR:
 a. The extent of the district's non-compliance (isolated oversight versus systematic disregard of TABOR requirements).
 b. The purpose of the provision violated and whether that purpose is substantially achieved despite the district's non-compliance.
 c. Whether it can reasonably be inferred that the district made a good faith effort to comply or whether the district's non-compliance is more properly viewed as the product of an intent to mislead the electorate.