2014 COA 106

**TABOR FOUNDATION, a Colorado non-profit Corporation, Plaintiff–Appellant,**

**v.**

**COLORADO BRIDGE ENTERPRISE; Colorado Transportation Commission; Trey Rodgers, Gary M. Reiff, Heather Barry, Kathy Gilliland, Kathy Connell, Douglas Aden, Steve Parker, Les Gruen, Gilbert Ortiz, and Edward J. Peterson, all in their official capacity as a member of the Colorado Transportation Commission, Defendants–Appellees.**

**Court of Appeals No. 13CA1621**

Colorado Court of Appeals,
Div. II.

Announced August 14, 2014

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2013.

City and County of Denver District Court No. 12CV3113, Honorable Michael A. Martinez, Judge.

James M. Manley, Denver, Colorado; Steven J. Lechner, Lakewood, Colorado, for Plaintiff–Appellant.

John W. Suthers, Attorney General, Harry S. Morrow, Assistant Attorney General, Megan Paris Rundlet, Assistant Attorney General, Robert C. Huss, Assistant Attorney General, Denver, Colorado, for Defendant–Appellee Colorado Bridge Enterprise.

Recht Kornfeld, P.C., Mark G. Grueskin, Denver, Colorado, for Defendants–Appellees Colorado Transportation Commission, Trey Rodgers, Gary M. Reiff, Heather Barry, Kathy Gilliland, Kathy Connell, Douglas Aden, Steve Parker, Les Gruen, Gilbert Ortiz, and Edward J. Peterson.

Opinion by JUDGE CASEBOLT

¶ 1   In this proceeding involving the Taxpayer's Bill of Rights (TABOR), Colo. Const. art. X, § 20, plaintiff, TABOR Foundation (Foundation), appeals the judgment denying its claims for injunctive relief and declaratory judgment against the Colorado Bridge Enterprise (CBE); the Colorado Transportation Commission (Commission); and the individual members of the Commission, Trey Rodgers, Gary M. Reiff, Heather Barry, Kathy Gilliland, Kathy Connell, Douglas Aden, Steve Parker, Les Gruen, Gilbert Ortiz, and Edward J. Peterson, all in their official capacities.   The trial court held that the CBE did not levy a TABOR-prohibited tax when it imposed a bridge safety surcharge, but instead imposed a permissible fee.   It further held that the CBE operates as a TABOR-exempt enterprise and did not violate TABOR by issuing bonds without submitting the matter to voters in a statewide election. We affirm.

I.   Background and Procedural History

¶ 2   In 1992, Coloradans adopted TABOR, which limits the power of the state, its subdivisions, and its districts to levy taxes or create debt.   See id.   TABOR requires voter approval for any new tax and for the issuance of debt.   Id. at § 20(4)(a), (b).   Enterprises, as defined by TABOR, are exempt from TABOR's voter approval requirements.   See id. at § 20(2)(b), (4).

¶ 3   In 2009, the General Assembly created the CBE through the "Funding Advancements for Surface Transportation and Economic Recovery Act" (FASTER).   See § 43–4–805, C.R.S.2013.   The statute defines the CBE as a "government-owned business" within the Colorado Department of Transportation (CDOT), § 43–4–805(2)(a)(I), and authorizes the CBE to impose a bridge safety surcharge in order to finance, repair, reconstruct, and replace any designated bridge

in the Colorado highway system, without being subject to TABOR. *See* § 43–4–805(2)(b), (c). The General Assembly also declared the CBE to be an enterprise exempt from TABOR requirements. § 43–4–805(2)(c).

¶ 4 The CBE's continuing exemption from TABOR depends on the source and amount of its revenue. Colo. Const. art. X, § 20(2)(d); § 43–4–805(2)(c). Essentially, so long as the CBE retains the authority to issue revenue bonds and receives less than ten percent of its total revenues in grants from all Colorado state and local governments combined, it is not subject to TABOR. *See* § 43–4–805(2)(c).

¶ 5 Although the CBE is within CDOT, the two have separate financial accounting and reporting systems and maintain separate financial administration. Within the state treasury, there are separate funds for CDOT and the CBE. The General Assembly retained no authority to spend CBE funds; instead, all CBE revenues are spent under the exclusive authority of the CBE's Bridge Enterprise Board, composed of members of the Commission. *See* § 43–4–805(2)(a)(I).

¶ 6 The General Assembly authorized the CBE to impose the bridge safety surcharge "at rates reasonably calculated to defray the costs of completing designated bridge projects and distribute the burden of defraying the costs in a manner based on the benefits received by persons paying the fees and using designated bridges." § 43–4–805(1)(b)(II). The General Assembly empowered the CBE to impose the surcharge on and after July 1, 2009, upon any vehicle for which a registration fee must be paid, and specified the amount of the charge, which depends upon the type and weight of the particular vehicle. § 43–4–805(5)(g)(I). The greater the weight, the greater is the charge, because heavier vehicles cause more significant impact and do more to shorten the lifespan of a bridge. The charge and the rate do not depend on a particular vehicle's actual use of a CBE bridge.

¶ 7 Revenue generated from the bridge safety surcharge is credited to the CBE's treasury account, and the use of such revenue is restricted to the CBE's statutorily-defined purpose of financing, repairing, reconstructing, and replacing any designated Colorado highway bridge. *See* § 43–4–805(2)(b). None of the CBE's revenue is available for general expenses of the state, and none of the fee revenue is credited to the state's general fund.

¶ 8 In addition to revenue from the bridge safety surcharge, the Commission authorized the CBE to receive up to $15 million in reimbursement from federal transportation funds that were allocated to Colorado in fiscal year 2011. To be eligible for this federal reimbursement, the CBE had to apply directly to the Federal Highway Administration (FHWA). The FHWA reviews applications, and, in its sole discretion, approves or denies the reimbursement requests. In fiscal year 2011, the CBE applied for and received $14.4 million from the FHWA for reimbursement for bridge projects. These reimbursement funds were credited directly to the CBE's treasury account and did not pass through CDOT's accounts.

¶ 9 The CBE's treasury account also contains funds from bond proceeds. In fiscal year 2011, the CBE issued $300 million in bonds. No public vote was held to authorize the CBE to issue these bonds.

¶ 10 In 2011, the CBE received revenue from the bridge safety surcharge, federal funding, and property transfers from CDOT. The CBE's total revenue for fiscal year 2011 was $78.5 million. Also in fiscal year 2011, CDOT transferred fifty-six deteriorated bridges and associated design work to the CBE. All of those bridges were in use at the time of transfer. They were valued under a depreciation method, and only two of the bridges were deemed to have value for TABOR purposes. The remaining fifty-four bridges each had a depreciated value under $500,000 and, under the state's accounting principles, were given a value of $0 for TABOR purposes. The CBE never calculated a fair market value for the bridges.

¶ 11 In 2012, the Foundation commenced this action, asserting that defendants had violated the rights of the Foundation's members under TABOR to vote on new taxes and debt issuance. The Foundation contended

that (1) the CBE's bridge safety surcharge was a tax and the CBE levied it without first seeking voter approval; and (2) the CBE must have voter approval before issuing debt because it does not qualify as a TABOR-exempt enterprise, since it has the power to tax and it received more than ten percent of its 2011 revenue from state grants.

¶ 12 At trial, the parties presented evidence that the state has approximately 3500 bridges in the state highway system. However, only 168 bridges have been identified as eligible for CBE funding. These bridges are located in thirty-seven of the sixty-four Colorado counties. Twenty-seven counties, including Grand County, do not have a CBE-designated bridge within their borders. At the time of trial, the CBE had no plans to budget a repair or replacement of a bridge in Grand County.

¶ 13 The Foundation called two of its members from Grand County to testify at trial. They objected to paying the bridge safety surcharge on at least one of their vehicles because that vehicle was used only within Grand County and therefore never used a CBE-designated bridge. However, both witnesses testified that they did take or allow other vehicles to be taken out of the county and may have received the benefits of the bridge safety surcharge as to those vehicles.

¶ 14 Both the Foundation and the CBE called expert witnesses in accounting. The Foundation's expert opined that the fifty-six transferred bridges should have been evaluated under a fair market value standard as opposed to a depreciation method. He further testified about the condition of the two valued bridges, opined that the CBE had undervalued them, and stated that the remaining fifty-four bridges had value for TABOR purposes.

¶ 15 In contrast, the CBE's expert witness, a former State Controller, testified that in practice, the State Controller's Office makes TABOR calculations using general accepted accounting principles promulgated by the Governmental Accounting Standards Board because it must maintain a unified system of accounts. These standards required CDOT to use either the "modified" approach or the "depreciation" approach to valuation, and CDOT had used the latter. The expert further testified that had CDOT used a fair market value approach, the valuation would have been questioned by the State Auditor.

¶ 16 At the conclusion of trial, the trial court made extensive findings of fact and found in favor of defendants on both claims. This appeal followed.

## II. Is the Bridge Safety Surcharge a Tax?

¶ 17 The Foundation contends that the surcharge is a tax because it is collected without regard to any services utilized by the vehicles for which the charge is imposed and thus fails to meet the definition of a TABOR-exempt fee. We disagree.

### A. Standard of Review for TABOR Issues

¶ 18 We review a trial court's factual findings under the clear error standard. *Di-Cocco v. Nat'l Gen. Ins. Co.*, 140 P.3d 314, 316 (Colo. App. 2006). We review a trial court's legal conclusions concerning the interplay of TABOR and related statutes de novo. *HCA–Healthone, LLC v. City of Lone Tree*, 197 P.3d 236, 240 (Colo. App. 2008).

¶ 19 Where multiple interpretations of TABOR are equally supported by the text, a court should choose that interpretation which it concludes would create the greatest restraint on the growth of government. *Bickel v. City of Boulder*, 885 P.2d 215, 229 (Colo. 1994) (citing Colo. Const. art. X, § 20(1)). The proponent of an interpretation has the burden of establishing that its proposed construction of TABOR would reasonably restrain the growth of government more than any other competing interpretation. *Nicholl v. E–470 Pub. Highway Auth.*, 896 P.2d 859, 867 (Colo. 1995).

¶ 20 Additionally, unjust, absurd, or unreasonable results should be avoided. *Id.* Hence, an interpretation of TABOR that could lead to an absurd result and "cripple the everyday workings of government" should not be employed. *See In re Submission of Interrogatories on House Bill 99–1325*, 979 P.2d 549, 557 (Colo. 1999).

## B. Applicable Law

¶ 21 The purpose of a tax is to "provide revenues in order to defray the general expenses of government as distinguished from the expense of a specific function or service." *Bloom v. City of Fort Collins*, 784 P.2d 304, 307 (Colo. 1989). "Unlike a tax, a special fee is not designed to raise revenues to defray the general expenses of government, but rather is a charge imposed upon persons or property for the purpose of defraying the cost of a particular governmental service." *Barber v. Ritter*, 196 P.3d 238, 248 (Colo. 2008) (quoting *Bloom*, 784 P.2d at 308). Therefore, a fee may be subject to invalidation as a tax when the principal purpose of the fee is to raise revenues for general governmental purposes rather than to defray the expenses of the particular service for which the fee is imposed. *Bloom*, 784 P.2d at 308.

¶ 22 "To determine whether a government mandated financial imposition is a 'fee' or a 'tax,' the *dispositive* criteria is the primary or dominant purpose of such imposition at the time the enactment calling for its collection is passed." *Barber*, 196 P.3d at 248 (emphasis added). This inquiry requires examination of several factors.

¶ 23 First, we review the language of the enabling statute. *Id.* at 249. If the language states that a primary purpose is to raise revenues for general governmental spending, it is a tax; but if it indicates that the primary purpose of the charge is to finance a particular service, then the charge is a fee. *Id.* The fact that a fee incidentally or indirectly raises revenue does not alter its essential character as a fee, transforming it into a tax. *Id.*

¶ 24 Second, we look to the primary or principal purpose for which the money is raised, not the manner in which it is ultimately spent. *Id.* (if the primary purpose for the charge is to raise revenues for general governmental spending, then the charge is a tax); *see Bloom*, 784 P.2d at 307–08.

¶ 25 Third, we look to see if the primary purpose of the charge is to finance or defray the cost of services provided to those who must pay it. *Barber*, 196 P.3d at 241, 249.

¶ 26 Any fee amount must be reasonably related to the overall cost of the service; however, mathematical exactitude is not required. *Bloom*, 784 P.2d at 308. The particular mode adopted by an entity in assessing the fee is generally a matter of legislative discretion. *Id.*

## C. Application

### 1. Primary Purpose of the Charge

¶ 27 The General Assembly was very clear in the statutory scheme creating the CBE that it intended the bridge safety surcharge to be a fee, not a tax. Section 43–4–805(2)(c) provides in pertinent part that the surcharge

> is not a tax but is instead a fee imposed by the bridge enterprise to defray the cost of completing designated bridge projects that the enterprise provides as a specific service to the persons upon whom the fee is imposed and at rates reasonably calculated based on the benefits received by such persons.

¶ 28 This directive follows the legislative declaration contained in sections 43–4–805(1)(a) & (b), which states that bridge projects are essential to address increasing traffic congestion, delays, hazards, injuries, and fatalities, and that creation of the CBE is necessary due to the limited availability of state and federal funding for repair, reconstruction, and replacement of bridges.

¶ 29 In addition, the General Assembly took note of the Colorado Supreme Court's decision in *Nicholl*, 896 P.2d 859, which had concluded that the power to tax was inconsistent with enterprise status under TABOR, and affirmatively declared that the CBE "shall constitute an enterprise for purposes of [TABOR]." § 43–4–805(2)(c). It further declared that as long as the CBE constitutes an enterprise, it "shall not be subject to any provisions" of TABOR. *Id.*

¶ 30 While we recognize that the General Assembly's declaration that the bridge safety surcharge is a fee does not necessarily make it so, *see Bruce v. City of Colorado Springs*, 131 P.3d 1187, 1190 (Colo. App. 2005) ("The distinction between a fee and a tax depends on the nature and function of the charge, not

on its label."), we cannot ignore the stated legislative intent. *See Barber*, 196 P.3d at 248. As the above language indicates, the legislature fully intended, at the time of the CBE's authorization, to make the surcharge a source of revenue for the specific government service of financing, repairing, reconstructing, and replacing any designated bridge for the safety of Coloradans and visitors to the state. § 43–4–805(1)(a)(b)(III); *see also* § 43–4–805(1)(c) (speaking to the safety aspect of repairing Colorado bridges). Further, it declared that the fee would provide a specific service to the persons upon whom the fee is imposed, and at rates reasonably calculated based on the benefits received by such persons. § 43–4–805(2)(c).

¶ 31   Hence, we conclude that the General Assembly's primary purpose was to create a charge that would finance a particular service. The legislative intent factor thus weighs in favor of concluding that the bridge safety surcharge is a fee.

### 2. Primary Purpose for Raising Revenue

¶ 32   Next, examining the primary or principal purpose for which funds are raised, we conclude that the charge can only be imposed for the purpose of financing, repair, reconstruction, and replacement of designated bridges. *See* § 43–4–805(1)(b)(I) (authorizing the CBE to enter into agreements for that purpose); § 43–4–805(1)(b)(II) (imposing the surcharge to defray the cost of completing designated bridge projects); § 43–4–805(2)(b) (describing the business purpose of the CBE as to finance, repair, reconstruct, and replace any designated bridge in the state); § 43–4–805(3)(a) (creating the "bridge special fund" in the state treasury, declaring it to be the sole depository for the funds generated by the bridge safety surcharge, as well as other CBE revenues, and also providing that "in no event may revenues from any tax otherwise available for general purposes be deposited into the bridge special fund"); § 43–4–805(3)(b) (providing that money in the bridge special fund shall be continuously appropriated to the CBE for the purposes set forth in the enabling statute and no part of the bridge special fund shall be used for any other purpose).

¶ 33   At trial, the court heard evidence that the CBE and CDOT had separate treasury accounts and that money from the bridge safety surcharge never passed into or through the CDOT account or the state's general fund. The trial court found, with record support, that the evidence "overwhelmingly demonstrates that the monies raised via the [bridge safety surcharge] are kept in a separate treasury account, to be used only for the CBE's authorized purpose."

¶ 34   We conclude that the bridge safety surcharge fee is raised solely for the purposes outlined in the CBE's enabling statute and not to defray the costs of general state expenses, which again weighs in favor of a determination that the surcharge is a fee, not a tax.

### 3. Relationship Between Charge and Service

¶ 35   The third factor is whether the primary purpose of the charge is to finance or defray the cost of services provided to those who must pay it. *See Barber*, 196 P.3d at 241, 249 (a charge is a fee when the primary purpose is to "defray the costs of services provided to those charged" or to "finance a particular service utilized by those who must pay the charge").

¶ 36   Initially, we note that the CBE enabling statute states that the fee should or will be imposed upon persons at rates reasonably calculated based on the benefits received, or use of the service, by the persons paying the fee. § 43–4–805(2)(c) ("rates reasonably calculated based on the benefits received by" the persons paying the fee).

¶ 37   But the Foundation asserts that, notwithstanding this statute, there must be a direct nexus or physical connection between an individual's use and the permissibility of a user fee, and there is none here. Essentially, it contends that the bridge safety surcharge is a tax because the surcharge is imposed and collected upon each vehicle registered in this state, and some persons, particularly those residing in counties that do not contain any CBE-designated bridges,

own registered vehicles that do not and will not cross any CBE bridges. Therefore, the Foundation argues, the surcharge is imposed upon persons who do not receive the benefit of the CBE's services or utilize any of its bridges. *See Barber*, 196 P.3d at 250 ("[T]he primary purpose of the enactments that created the special cash funds was solely to defray the cost of services provided to those assessed."); *Nicholl*, 896 P.2d at 869 ("[T]he power to unilaterally impose taxes, with no direct relation to services provided, is inconsistent with the characteristics of a business as the term is commonly used.").

¶ 38 This argument, however, reads too much into the language of *Barber*. The Foundation's argument essentially contends that the service must be utilized *only* by those who must pay the charge or alternatively by *all* those who must pay the charge. But the *Barber* court did not state or impose such requirements. Indeed, the supreme court has made it clear that even imposing a fee that generates revenues for street maintenance but not for any specific property does not support a conclusion that the charge is a tax, and not a fee. *See Bloom*, 784 P.2d at 309.

¶ 39 And it appears that a fee may be charged to persons who may not utilize the services at all. *See id.* at 310–11 (noting that the city could have elected to impose its transportation utility fee on all adult residents of the city, but instead imposed it on owners and occupants of developed lots that would benefit from the street maintenance program); *Loup–Miller Constr. Co. v. City & Cnty. of Denver*, 676 P.2d 1170, 1173–75 (Colo. 1984) (holding that sewage facilities development fee assessed to defray potential future costs of increasing capacity for new sewer connections was a fee, not a tax, although no new sewer service was actually provided and the fee was a charge for the city's readiness to provide future service); *see also Anema v. Transit Constr. Auth.*, 788 P.2d 1261, 1267 (Colo. 1990) (upholding, as a fee, an assessment to fund transit planning when the employers who paid the charge were "individuals and entities reasonably likely to benefit from a rapid transit system," and it was "reasonable to assume that employers within the service area would benefit from the development of such planning" (citing *Bloom*, 784 P.2d at 310)); *Bruce*, 131 P.3d at 1194 (Graham, J., dissenting) (noting that street lighting fee upheld by majority was imposed on a property owner even if he had no service from the street lights).

¶ 40 Essentially, as long as a charge is reasonably related to the overall cost of providing the service and is imposed on those who are reasonably likely to benefit from or use the service, the charge is a fee and not a tax.

¶ 41 Nor does the fee need to be voluntary in order to qualify as a fee rather than a tax. *See Bloom*, 784 P.2d at 310 (noting that the supreme court has "never held ... that a service fee must be voluntary").

¶ 42 Furthermore, even if we were to conclude that there must be some kind of direct connection or nexus between the services provided and an individual's use of those services, we would not view that factor as outcome determinative here. *Barber* does not posit the third factor, as we have described it, as an all or nothing proposition. *See* 196 P.3d at 248–50. Stated differently, nothing in *Barber* instructs that the failure to provide a service to each individual or all individuals charged automatically renders a charge a tax.

¶ 43 Here, at trial, the Foundation presented testimony of two of its members from Grand County, who claimed one or more of their vehicles was subject to the surcharge, but was not used outside of the county and therefore did not cross any CBE bridges. However, both of these witnesses owned other vehicles that were capable of travel outside of the county and could cross CBE bridges. Therefore, they received the benefits of the CBE's services (making safe bridges available) and could utilize CBE bridges, even though some of their vehicles did not. Because they would be reasonably likely to benefit from one or more CBE bridges, the fact that one or more of their vehicles might never use a bridge does not change the outcome.

¶44 For all these reasons, we conclude that the bridge safety surcharge is a fee, not a tax. The General Assembly repeatedly declared that the surcharge is a fee, the purpose of which is to pay for the repair of unsafe bridges, and that the money is raised for and may be used only to repair and replace designated bridges. The evidence at trial was overwhelming that money raised by the surcharge was not raised, and could never be used, for general government purposes, given the structure of the treasury accounts and the language of the enabling statute.

¶45 The only factor that could indicate that the charge is actually a tax is that persons registering their vehicles might never use a CBE bridge. However, that factor is not determinative, and the mode adopted by an entity in assessing the fee is a matter of legislative discretion. *Bloom,* 784 P.2d at 308. Thus, we decline to hold that a specific nexus is required, and conclude that the fee is properly imposed on those who are reasonably likely to benefit from or use the service.

¶46 Accordingly, the trial court did not err in rejecting this claim.

### III. Is the CBE an Enterprise?

¶47 The Foundation contends that the trial court erred in finding that the CBE is an enterprise exempt from TABOR requirements because (1) the CBE has the power to tax through the bridge safety surcharge; (2) the CBE received more than ten percent of its revenue from a state grant in the form of $14.4 million in federal payments requested by the Commission; and (3) the CBE received more than ten percent of its revenue from a state grant with the transfer of fifty-six bridges from CDOT to the CBE. We disagree.

### A. Applicable Law

¶48 TABOR requires all "districts" to hold elections to obtain voter approval in advance for increases in taxes and spending and direct or indirect debt increases. Colo. Const. art. X, § 20(4); *Nicholl,* 896 P.2d at 867. "District" is defined as "the state or any local government, excluding enterprises." Colo. Const. art. X, § 20(2)(b). Hence, as

the Foundation acknowledges, TABOR does not apply to enterprises.

¶49 In the TABOR context, an "enterprise" is "a government-owned business authorized to issue its own revenue bonds and receiving under 10% of annual revenue in grants from all Colorado state and local governments combined." *Id.* at § 20(2)(d). Therefore, in determining whether an entity is an enterprise for TABOR purposes, we must determine whether the entity is both "government-owned" and a "business" under the ordinary meaning and understanding of these terms. *Nicholl,* 896 P.2d at 867–68.

¶50 The parties agree that the CBE is a government-owned entity. They disagree, however, whether the CBE is a business and whether it received more than ten percent of its annual revenue in grants from the state or local governments in 2011.

¶51 "The term 'business' is generally understood to mean an activity which is conducted in the pursuit of benefit, gain or livelihood." *Id.* at 868. An entity that generates revenue by collecting fees from service users is a business. *Id.* But the ability to levy general taxes is inconsistent with the characteristics of a business and renders the entity a "district" for TABOR purposes. *Id.*

¶52 "Grant" is not defined within TABOR. *See* Colo. Const. art. X, § 20(2). However, "grant" is defined in section 24–77–102(7), C.R.S.2013, which is the definitions section of a statutory provision entitled "State Fiscal Policies Relating to Section 20 of Article X of the State Constitution."

¶53 The Foundation contends that the definitions in section 24–77–102 do not apply to TABOR because of the language limiting the definitions to those "as used in this article [77]" as stated at the beginning of section 24–77–102. But the supreme court has concluded that, in enacting sections 24–77–101 to –107, C.R.S. 2013, the General Assembly was "seeking to comply with the provisions of [TABOR] by enacting legislation consistent with the state fiscal year spending limit of [TABOR] *and to define certain terms used in [TABOR]." Submission of Interrogatories on Senate Bill 93–74,* 852 P.2d 1, 5 (Colo. 1993) (emphasis added)

(citing § 24–77–10 1). Furthermore, in setting out the purposes of Article 77, the General Assembly declared in section 24–77–101(1)(d)(f):

> (d) In interpreting the provisions of [TABOR], the general assembly has attempted to give the words of said constitutional provision their natural and obvious significance;
>
> (e) Where the meaning of [TABOR] is uncertain, the general assembly has attempted to ascertain the intent of those who adopted the measure and, when appropriate, the intent of the proponents, as well as to apply other generally accepted rules of construction;
>
> (f) The content of this article represents the considered judgment of the general assembly as to the meaning of the provisions of [TABOR] as it relates to state government.

¶ 54   We therefore reject the Foundation's contention and conclude that the definitions in section 24–77–102 apply to TABOR. The legislative declaration contained in section 24–77–101 and the *Submission of Interrogatories on Senate Bill 93–74* case, 852 P.2d at 5, demonstrate that article 77 has broader application.

¶ 55   Accordingly, the definition of "grant" in section 24–77–102(7) applies to TABOR provisions, including as that term is used in the definition of enterprise set forth in section 20(2)(d) of TABOR. In further support of this conclusion, we note that section 24–77–102 uses the same definition of "enterprise" as that contained in TABOR. § 24–77–102(3).

¶ 56   Under section 24–77–102(7)(a), a grant is "any direct cash subsidy or other direct contribution of money from the state or any local government in Colorado which is not required to be repaid." Furthermore, a grant does not include "[a]ny federal funds, regardless of whether such federal funds pass through the state or any local government in Colorado prior to receipt by an enterprise." § 24–77–102(7)(b)(III). This definition is identical to the definition of "grant" in the CBE enabling statute. § 43–4–803(13), C.R.S.2013.

### B.   Application

#### 1.   Power to Tax and the CBE As a Business

¶ 57   The Foundation asserts that the CBE is not an enterprise because it has the power to unilaterally tax through the bridge safety surcharge. We have concluded above that the surcharge is a fee, not a tax, and we therefore reject this contention.

¶ 58   The Foundation nevertheless relies on a 1995 Attorney General Opinion for the proposition that, to be considered a business, an enterprise must gain its revenue from "market exchanges taking place in a competitive, arms-length manner." Colo. Att'y Gen. Op. No. 95–07 (Dec. 22, 1995). The Foundation asserts that. the CBE's revenue is not derived from such exchanges, but rather from tax revenue generated by the bridge safety surcharge, and further that the CBE is not engaged in an activity conducted in the pursuit of benefit, gain, or livelihood.

¶ 59   However, the *Nicholl* court noted that the payment of a toll for access to a highway is not a competitive market exchange, yet it held that such a transaction is consistent with an enterprise and fits the definition of a business. 896 P.2d at 868. Hence, we, like the court in *Colorado Common Cause v. Meyer*, 758 P.2d 153, 159 (Colo. 1988), respectfully decline to follow the Attorney General's Opinion and engage in our own interpretation of the law.

¶ 60   We conclude that the CBE is a business because it pursues a benefit and generates revenue by collecting fees from service users. *See Nicholl*, 896 P.2d at 868. Because the bridge safety surcharge is a fee and the CBE is a business providing a government service for a fee, we conclude that the CBE meets the appropriate definitions.

#### 2.   Revenue from State Grants

¶ 61   The Foundation next argues that CDOT's transfer of $14.4 million in federal funds to the CBE's bridge special fund was a state grant that exceeded the ten percent annual cap on state grant funding. The Foundation asserts that the $14.4 million was not really federal funding because the

CBE received the money only because of the Commission's actions in allowing the CBE to receive the reimbursement. We are not persuaded.

¶ 62 The definition of a grant specifically excludes federal funding, even if that funding first passes through state or local governments. §§ 24–77–102(7)(b)(III), 43–4–803(13)(b)(II).

¶ 63 Here, the CBE, not the Commission or CDOT, had to apply for the funding through the FHWA reimbursement program and it was within the FHWA's sole discretion whether to grant the reimbursement. The $14.4 million was directly credited into the CBE's account and did not pass through accounts belonging to CDOT. At no time could CDOT or the Commission exert control over the FHWA money. The only "control" the Commission exerted was to sign a resolution authorizing the maximum amount the CBE could receive of Colorado's fiscal year 2011 federal reimbursements. This resolution does not change the nature of the money from federal funding to a state grant.

¶ 64 Hence, the $14.4 million the CBE received from the FHWA does not count towards the CBE's state grant cap, and thus, does not preclude finding the CBE to be an enterprise.

### 3. Revenue from Transferred Bridges

¶ 65 The Foundation also contends that the transfer of fifty-six bridges from CDOT to the CBE was a state grant that, if calculated using the fair market value method, independently exceeds the ten percent of annual revenue allowed under the definition of an enterprise. We disagree.

¶ 66 Grants are cash subsidies or other direct monetary contributions. § 24–77–102(7)(a). Bridges, although they may have value, are not cash subsidies or monetary contributions. Therefore, the bridges transferred from CDOT to the CBE are not state grants for purposes of determining enterprise monetary limits. Furthermore, even if we were to consider the bridges as "monetary" in nature, they would not be a direct monetary contribution, see id. but would instead be an indirect benefit, which is specifically excluded from the definition of a grant. See § 24–77–102(7)(b)(I).

¶ 67 Because the transfer of the fifty-six bridges does not constitute a state grant to the CBE and therefore is not counted in calculating the amount of the CBE's fiscal year 2011 revenue originating from state grants, we need not address the Foundation's assertion that CDOT or the CBE undervalued the transferred bridges and should have used a fair market value approach to valuation rather than the depreciation method employed.

¶ 68 Accordingly, the trial court did not err in concluding that the CBE is an enterprise.

### IV. The Foundation's Expert Witness

¶ 69 The Foundation asserts that the trial court erred in precluding its expert witness from testifying. We disagree.

¶ 70 We first note that the Foundation's expert was not precluded from testifying. Instead, the court allowed his testimony and admitted his report into evidence, but found the expert unpersuasive because his techniques were questionable and unreliable. The court therefore made a credibility determination rather than reaching a conclusion on the admissibility of the expert's testimony.

¶ 71 In any event, however, given our determination that the transferred bridges were not a state "grant," the value of the bridges has no bearing on the determination of the CBE's enterprise status, and the expert's testimony was consequently irrelevant. Hence, we need not further address the court's conclusion regarding the admissibility of the expert's testimony or his credibility.

### V. Attorney Fees

¶ 72 The Foundation requests attorney fees under TABOR, Colo. Const. art. X, § 20(1). That provision states that "[s]uccessful plaintiffs are allowed costs and reasonable attorney fees." Id. Because the Foundation has not been successful either at trial or on appeal, we deny the request for attorney fees.

## VI. Conclusion

¶ 73 The judgment is affirmed.

Berger and Márquez *, JJ., concur.